IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONALD ANDERSON,                )
                                )
                Plaintiff,       )        CV 04-908-PA
                                )
        v.                       )        **OPINION AND ORDER**
                                )
YAMHILL COUNTY, RANDY            )
SETTELL, personally, and         )
DWIGHT CARTER, personally,       )
                                )
                Defendants.      )

**PANNER, J.**

Plaintiff Donald Anderson brings this 42 U.S.C. § 1983 action against defendants Yamhill County, Randy Settell, and Dwight Carter. Defendants' motion for summary judgment is denied.

## Background

The facts are stated in the light most favorable to Plaintiff. On November 9, 2001, Yamhill County Circuit Court Judge John Collins revoked Anderson's probation and sentenced him to a term of incarceration in the Yamhill County Jail ("the Jail"). The sentence pronounced in court did not include a term of Post Prison Supervision ("PPS") following Anderson's release. On December 4, 2001, Judge Collins signed the formal Order and Judgment. Again, no term of PPS was imposed.

On March 22, 2002, Anderson was released after completing his sentence.  ORS 144.102(1) mandates that when a person is subject to PPS, a written copy of his conditions of PPS "shall be given to the person upon release from prison or jail."  Anderson was not furnished with such a document, nor told he would be on PPS following his release.

Yamhill County Community Corrections ("YCCC") was the entity responsible for furnishing Anderson with such a document, if applicable to his situation.  <u>See</u> ORS 144.102(1).  At all relevant times, Richard Sly was Director of YCCC.  Sly knew Judge Collins had not imposed a term of PPS upon Anderson.  Around February 1, 2002, Sly informed Judge Collins and Deputy District Attorney Carroll Tichenor of this (alleged) omission.  Sly sent copies of his memorandum to Defendant Settell and YCCC Office Manager Vicki Wood.  Sly did not send a copy to Anderson or even to Carol Jones, the attorney who had represented Anderson during the probation revocation proceeding.

DDA Tichenor eventually presented, *ex parte,* an order to Judge Collins, styled as a "<u>First Amended</u> Order Revoking Probation.  Judgment."  This document purported to increase Anderson's sentence by adding a one-year term of Post Prison Supervision.  Neither Anderson nor his former attorney, Carol Jones, were informed of this development or given an opportunity to oppose the proposed modification.

Judge Collins signed the order on April 5, 2002 --two weeks after Anderson had completed his sentence and been released from the Jail.  A copy of the order was placed in attorney Jones' box at the courthouse.  Jones eventually received it, but she did not

forward it to Anderson.  The record contains no evidence Jones still represented Anderson, or was still communicating with him.

On April 26, 2002, Sly, acting in the name of the YCCC, signed an order purporting to establish Anderson's "supervision conditions."  This document was generated over a month after Anderson's release from the Jail, a fact Sly should have known. The caption indicates that YCCC was the agency to whom Anderson would be reporting.  However, the order does not specify when he must report, or how often.  The only relevant language reads:

> 8.    Permit the supervising officer to visit the offender or the offender's residence or worksite . . . . Report as required and abide by the direction of the supervising officer.

Anderson was never ordered to report nor given any direction by the "supervising officer."  Neither Sly, nor anyone else at YCCC, attempted to deliver this order to Anderson.  The order includes a section where receipt is to be acknowledged by the person being supervised, and a witness.  Those lines were blank.

Meanwhile, approximately three days after Anderson's release from the Jail, he was arrested on a Washington County warrant for failing to appear in court on unrelated charges.  (Apparently, Anderson was still in the Jail the day that hearing was to have taken place.)  Some time between April 30 and May 6, 2002 --the parties have done a poor job of stating the historical facts-- Anderson was released by Washington County after posting bail.

On May 17, 2002, defendant Settell requested a warrant for Anderson's arrest.  Settell represented that Anderson was subject to PPS, that he had "absconded," and that Anderson's present whereabouts or address were unknown.  In reality, Settell had no

idea whether Anderson had "absconded," because Settell had made
no effort to ascertain Anderson's whereabouts.  Settell had an
address for Anderson, but did not try to contact him there, or
even send a letter advising Anderson that he was subject to PPS
and directing him to report.  At deposition, Settell insisted he
is not required to make any effort to contact persons he
supervises before declaring them to have "absconded."[1]  Settell
also stated categorically, "I don't send letters."

The warrant request also asserted that "Anderson has failed
to update his sex offender registration . . . ."  This
requirement stemmed from a statutory rape conviction in 1991.
Anderson had most recently registered on September 28, 2001.  ORS
181.596 requires, in relevant part, that a person subject to
registration "report, in person: (A) Within 10 days of a change
of residence; and (B) Once each year within 10 days of the
person's birth date, regardless of whether the person changed
residence."  Anderson's birthday is July 1.  He did not have to
report again until July 11, 2002, unless his residence changed.

On May 23, 2002, Richard Sly approved Settell's request and
issued a warrant for Anderson's arrest.[2]  The warrant states that
Anderson is to be "DETAINED UNTIL FURTHER ORDER OF THE [Yamhill

---

[1] At deposition, Settell expressed doubt that Anderson was
physically residing at the address Settell had for Anderson,
suggesting it might be a place where Anderson received mail.
Even so, Settell has not explained why a mailing address was not
sufficient if his intent was to contact Anderson and request that
he report to Settell.  Settell's deposition testimony also
evidenced some hostility towards Anderson, along with a repeated
refusal to give straightforward answers to simple questions.

[2]  The warrant also purports to be in the name of Yamhill
County Sheriff Norm Hand, but it was not signed by Sheriff Hand.

County Local] SUPERVISORY AUTHORITY.  THIS IS A NO BAIL WARRANT.
DOES NOT GO TO COURT."  (Emphasis in original).

On July 8, 2002, within ten days of his birthday, Anderson
voluntarily went to update his sex offender registration.  An
officer discovered the Yamhill County warrant and arrested
Anderson.  He denied being on PPS.  Nevertheless, pursuant to the
warrant, Anderson was taken to the Jail.  Anderson was already
scheduled to be in a Washington County courtroom the following
day.  When he failed to appear, his bail was forfeited (though
Defendants say it eventually was refunded).

At some point, Settell visited Anderson in jail.  Anderson
was adamant that the sentence imposed on him did not include a
term of PPS, and he had not been ordered to report to Settell.
Settell insisted that was irrelevant, and made no attempt to
investigate Anderson's statements or seek legal advice.  Instead,
Settell requested that sanctions be imposed on Anderson for
violating PPS.  Anderson's insistence that he had done nothing
wrong was cited by Settell as an aggravating factor.

Anderson was not promptly brought before a judge, allowed to
consult with an attorney, and given a probable cause hearing.
Instead, he was imprisoned for ten days before Defendant Carter
gave Anderson a "Notice of Rights."  On or about July 18, 2002,
Carter was designated "Hearings Officer/Supervisory Authority
Representative."

Anderson requested a hearing and an appointed attorney.
Carter denied Anderson's request for counsel, and gave the
following reasons:  (1) "there isn't a timely and colorable claim
that the offender has not committed the alleged violations of

conditions;" (2) the "reasons which justify or mitigate the violation are not complex or otherwise difficult to develop or present"; and (3) the "offender is capable of speaking effectively on his or her own behalf."[3]

The first reason was clearly erroneous. Carter knew Anderson denied being on PPS or having been directed to report to Settell. If this were true, it would be a defense to the charge against Anderson. The second reason was also incorrect. At deposition, Carter admitted "this case was complex," and he "consider[ed] it complex at the time of the hearing[.]"[4] An attorney would have been invaluable in articulating why Anderson was not on PPS and had not violated PPS.

At deposition, Carter testified that when trained as a Hearing Officer, he was instructed that if he wanted to deny a request for counsel, he should mark all three reasons listed on the form. Carter said his true reason for not appointing counsel was actually that Anderson wanted Carol Jones to represent him, but Carter knew she was out of town and he did not want to keep

_____

[3] This language was part of a standard form that appears to be derived from <u>Gagnon v. Scarpelli</u>, 411 U.S. 778, 790-91 (1973). <u>See also</u> ORS 144.343(3)(f) (employing similar language).

[4] After conferring with counsel, Carter sought to recant that testimony. His new explanation was that a "complex" issue or case means "someone who has some kind of mental incapacity . . . low IQ would negate them from being able to testify in their own behalf or even understand what's going on. Or if they're under the influence of drugs and hallucinates and aren't aware of what their surroundings are." That contradicts the plain language of the document. Moreover, such circumstance is already addressed by "(3) [whether the] offender is capable of speaking effectively on his or her own behalf."

Anderson in custody until she returned.[5]  A roughly
contemporaneous report by Settell mentions a second reason why
Carter refused to appoint an attorney for Anderson -- because
"Jones was the attorney that failed to notified (sic) him on
being on PPS."

On July 25, 2002, Carter conducted an informal hearing.  By
now, Anderson had been in custody for 17 days.  Settell was
present as "Officer of Record."  A tape recording of that hearing
reportedly exists, but the parties have not furnished a copy or
transcript.  I must therefore reconstruct what transpired from
sources such as depositions and reports, along with a brief
snippet of the tape played at a deposition.

Anderson again requested an attorney, and offered to wait
for Jones to return.  Carter denied this request.  Anderson
reiterated that he was not sentenced to PPS, and had not known he
was on PPS or that he was required to report to Settell.  The
latter acknowledged that the sentence originally imposed on
Anderson did not include PPS, but cited the amended judgment as
proof that Anderson was on PPS.  Settell also told Carter that
Anderson was automatically subject to PPS regardless of what
Judge Collins had said in passing sentence or had written in the
Judgment.  Carter then announced his ruling (or at least this is
the portion the parties have submitted):

> [I]t's not the fault of your parole officer, nor
> Yamhill County, or even the Parole Board, that you were

---

[5] Carter has not explained why he did not release Anderson
pending her return.  The duration of the proposed sanction --30
days, of which 10 had already been served-- undermines any
suggestion he had to be detained as a flight risk or danger to
the community.  Anderson would be released soon anyway.

not advised that you were still actively on
supervision.  Your attorney should have known the law
and she also received a copy that you were actively on
supervision, so it was actually her responsibility to
make you aware  . . . . And the fact that she didn't
still doesn't -- as I said before ignorance of the law
doesn't get you off being on supervision.  And so you
are actively on supervision . . . [and] I find that you
did violate your supervision by not reporting.

At deposition, Carter confirmed he believes a defendant is
"automatically on" PPS and subject to all conditions thereof
regardless of "whether the court order reflects it or not . . .
[or] whether it's stated in open court" and "no matter what your
defense attorney tells you."  In Carter's view, it does not
matter whether the defendant was ever told he was being placed on
PPS or given notice of the conditions he must adhere to.

Carter found Anderson guilty of violating PPS by not
reporting to Settell, and imposed an "administrative sanction" of
thirty days in jail.  A formal order to that effect was signed by
Richard Sly on August 2, 2002.

Concerning the charge of failing to update his sex offender
registration, Anderson testified he believed that he had to re-
register each year within ten days of his birthday, or sooner if
he changed residences.  He still resided at his registered
address, and less than one year had passed, so he did not think
he needed to register again.  He was arrested after he went to
update his registration within ten days of his birthday.  Carter
found Anderson not guilty on that charge.

Technically, Anderson could appeal Carter's decision to
either Richard Sly or the Oregon Board of Parole and Post-Prison
Supervision --the record is not clear which-- and then to the

Oregon Court of Appeals. It is uncertain whether Anderson did, but the issue is academic. Defendants made it clear that Anderson would remain in jail in the interim. The "sanction" would be fully served before any appeal was heard. Moreover, Anderson was not represented by counsel, hindering his ability to seek relief.[6]

Following his release from the Jail, Anderson was taken into custody by Washington County as a consequence of the failure to appear on July 9, 2002.

## Discussion

Defendants' summary judgment submissions essentially boil down to (1) repeatedly reciting Anderson's criminal history, and (2) a conclusory assertion that Defendants did nothing wrong and are immune from suit anyway. This falls far short of what is necessary to obtain summary judgment in this case.

### A.   Automatic Post Prison Supervision

Defendants contend Anderson was automatically on post prison supervision, regardless of whether such term was included in the sentence the state court imposed upon Anderson. Defendants rely almost entirely upon *ipse dixit* assertions.[7]

---

[6] Anderson eventually was able to contact attorney Jones. She filed a motion of some sort (it is not in the record) seeking judicial review. By then, Anderson had finished serving the 30-day sanction. On August 14, 2002, Judge Collins denied the motion. The order contains no explanation, but other evidence suggests the judge believed he lacked jurisdiction.

[7] Defendants' brief does cite a few provisions that do not come close to supporting Defendants' position. For instance, Defendants cite ORS 137.540(5) ("The court may at any time modify the conditions of probation.") Anderson was not on probation anymore, nor does this citation explain where Defendants derive the authority to modify the sentence imposed by the court. Defendants cite ORS 137.540(4) ("Failure to abide by all general

Even assuming, *arguendo*, that Judge Collins was supposed to impose a term of PPS, it is undisputed that the sentence imposed on Anderson did <u>not</u> include a term of PPS.  The prosecutor did not contest the (alleged) omission.  Defendants cite no legal authority permitting them to unilaterally implement the sentence they believe the court <u>should</u> have imposed.  <u>Cf.</u> <u>Gaynor v. Board of Parole and Post-Prison Supervision</u>, 165 Or. App. 609, 611 (2000) ("We hold that the Board does not have the statutory authority to extend a post-prison supervision term beyond the term imposed by the trial court," even if the trial court mistakenly imposed a 36-month term of PPS when a statute mandated a life term for the offense).[8]

It is the sentence imposed by the court that determines the duration of imprisonment and of any post-prison supervision.  <u>See</u> ORS 137.010(10) ("A judgment of conviction that includes a term

_____

and special conditions *imposed by the court and supervised by . . . a county community corrections agency* may result in arrest") (emphasis added).  This section likewise concerns probation.  It also reinforces the principle that conditions of supervision are imposed by the court.

   Defendants also cite ORS 144.085(1).  When Anderson was sentenced in 2001, it provided that "All prisoners sentenced to prison for more than 12 months shall serve active periods of parole or post-prison supervision . . . ."  However, Judge Collins did not sentence Anderson "to prison for more than 12 months."  A prior version of ORS 144.085 lacked the 12-month restriction, but it was amended effective June 30, 1995.  1995 Oregon Laws, Ch. 423, §§ 22, 34.  The crime for which Anderson was sentenced occurred on July 16, 1995.  "Order Revoking Probation. Judgment."  That version was still in effect when Anderson was sentenced, so there is no need to decide which version prevails.  Regardless, ORS 144.085(1) does not say a term of post-prison supervision applies even if it is not included in the sentence imposed by the court.

   [8] <u>Gaynor</u> was abrogated on other grounds by <u>State v. Hart</u>, 188 Or. App. 650, 655-56 (2003) (correcting erroneous dictum).

of imprisonment for a felony . . . shall state the length of incarceration and the length of post-prison supervision"); ORS 137.071(8) (2001) (judgment in criminal case "must specify clearly the court's disposition, including all legal consequences the court establishes or imposes").

Were it not necessary to mention a term of PPS in the judgment, then Richard Sly presumably would not have pointed out this omission later, and DDA Tichenor would not have attempted to repair the alleged oversight by tardily submitting a revised judgment. Those actions suggest that each believed a term of PPS is effective only if specified in the sentence imposed.

Defendants also cite no authority permitting an Oregon judge to increase a sentence, *ex parte*, over five months after it was imposed, two weeks <u>after</u> the defendant had been released from custody, and without notice. In some circumstances, a sentencing court may have limited authority to "correct any arithmetic or clerical errors or to delete or modify any erroneous term in the judgment," ORS 138.083(1) (2001), but that is not what the court did here. It purported to add an entirely new provision. In any event, such corrections are permissible only "after written notice to all the parties." <u>Id.</u> Defendants point to no provision of Oregon law authorizing *ex parte* modifications. <u>Cf.</u> ORS 137.030(1) (2001) ("the defendant shall be personally present" when judgment is pronounced for a felony).

Finally, Defendants cite no authority that a criminal defendant may be sanctioned for violating conditions of PPS if he was never informed he was on PPS or told the conditions thereof. <u>Cf.</u> <u>United States v. Ortuno-Higareda</u>, 421 F.3d 917, 923 (9th Cir.

2005) ("Because the government did not prove that Ortuno received any notice, written or oral, that he would be subject to Standard Condition One, a violation of that condition could not serve as the basis for revocation of his supervised release.")[9]

Anderson was not on PPS following his release from the Jail in March 2002. As such, Settell had no authority to procure a warrant for Anderson's arrest. YCCC Director Richard Sly had no authority to issue a warrant for Anderson's arrest or to order that he be held without bail and without recourse to the courts. Carter had no authority to order that Anderson be imprisoned for thirty days. Carter's authority covers only a narrow subset of individuals on PPS. Anderson was not on PPS at the time.

Viewing the record in the light most favorable to Anderson, it appears that Defendants Settell and Carter, and YCCC Director Sly, each had actual notice of facts that, at a minimum, should have raised grave doubts as to whether Anderson was on PPS, whether they had jurisdiction over Anderson, and whether Anderson had notice of the conditions he was alleged to have violated. They pressed ahead anyway, apparently without pausing to obtain legal guidance. On this record, a jury could find they were deliberately indifferent to Anderson's constitutional rights and toward their own jurisdiction over Anderson (or lack thereof).

**B.   Heck v. Humphrey**

This action is not barred by Heck v. Humphrey, 512 U.S. 477 (1994). A favorable verdict would not affect the underlying

---

[9] The federal statutes cited in Ortuno-Higareda are functionally equivalent to ORS 144.102(1), which mandates that a written copy of the conditions of PPS "shall be given to the person upon release from prison or jail."

conviction, nor release Anderson from custody any earlier. In
addition, Anderson was not in custody long enough to bring a
federal habeas petition and obtain a final decision prior to his
release.[10] It would have been dismissed as moot. See Spencer v.
Kemna, 523 U.S. 1 (1998).

Anderson's circumstances fall squarely within the exception
recognized in Nonnette v. Small, 316 F.3d 872 (9th Cir. 2002),
for "former prisoners challenging loss of good-time credits,
revocation of parole or similar matters[.]" Id. at 878, n. 7.
This is not a case where the plaintiff could have sought habeas
relief, but preferred damages. Cf. Cunningham v. Gates, 312 F.3d
1148 (9th Cir. 2002), distinguished by Nonnette, 316 F.3d at 877,
n. 6. In addition, Anderson's arrest and imprisonment occurred
without judicial involvement, a stark contrast to the typical
claim barred by Heck.

   C.  **Absolute Immunity**

Settell's argument for absolute immunity is largely
foreclosed by Swift v. California, 384 F.3d 1184 (9th Cir. 2004).
There, the Circuit held that state parole officers were not
absolutely immune for their actions in (1) investigating
suspected parole violations, (2) recommending initiation of
parole revocation proceedings, and (3) procuring the arrest and
detention of a parolee for alleged parole violations. Id. at
1191. I see no material difference between the role of the Swift
defendants and Settell's role here. The officers in Swift could
issue warrants and parole holds directly, whereas Settell needed

---

   [10]  That is true even if "custody" includes the subsequent
months when he remained subject to PPS.

Richard Sly's signature, but the distinction is not material.
Cf. Scotto v. Almenas, 143 F.3d 105, 112-13 (2d Cir. 1998)
(parole officer's recommendation to senior official to initiate
parole revocation proceeding is not comparable to initiating a
prosecution but rather is more analogous to police officer
applying for an arrest warrant), *cited with approval in* Swift,
384 F.3d at 1192.

Demoran v. F.A. Witt, 781 F.2d 155 (9th Cir. 1986), is
easily distinguished. The present case does not concern
preparation of presentencing reports for a judge, nor were
Defendants operating under a judge's supervision. Errors or even
wilful misstatements in presentencing reports may often be
corrected through the adversarial process before harm is done.
By contrast, unilaterally seizing and detaining a person, without
recourse to the courts or an attorney, omits the procedural
safeguards extant in the judicial process that reduce the need
for a damages remedy.[11]

Defendant Carter has a slightly stronger argument for
immunity. Nevertheless, I conclude his motion should be denied,
at least at this stage of the proceedings.

The Supreme Court has yet to decide whether any "parole
officials" are entitled to absolute immunity and, if so, which
officials and for what activities. See Martinez v. California,

_____

[11] Cf. Sellars v. Procunier, 641 F.2d 1295, 1300 (9th Cir.
1981) ("the balance might not be struck in favor of absolute
immunity [for judges] were it not for the presence of safeguards
built into the judicial process that tend to reduce the need for
private damages actions as a means of controlling
unconstitutional conduct.")

444 U.S. 277, 284 (1980) (reserving issue for another day).

In Sellars, 641 F.2d 1295, *scope of holding limited by* Swift, the Ninth Circuit extended absolute immunity to members of a State Parole Board with regard to the actual decision to grant, deny, or revoke parole and for actions "integral to those decisions." Swift, 384 F.3d at 1191.

Carter was not a member of a state parole board, and Anderson was not on parole. Those distinctions are significant. First, PPS commences after a defendant has served his full prison sentence, and is not discretionary. A defendant is entitled to remain free provide he complies with the conditions of his PPS. He is not simply serving the remainder of his prison sentence on an extended furlough, so to speak.

Second, a state parole board is typically a professional body with established procedures and regulations, assisted by trained staff and guided by precedent. For instance, members of Oregon's State Board of Parole and Post-Prison Supervision are appointed by the Governor for four-year terms, and subject to Senate confirmation. ORS 144.005, 144.015. Members may be removed from office for malfeasance, and must devote their "entire time to the performance of the duties imposed on the board . . . ." ORS 144.005. Procedures and standards are delineated, and final orders are subject to judicial review. There are provisions to appoint counsel in appropriate cases, both before the Board and on appeal. The Board routinely obtains legal guidance from the Attorney General's office.

The same cannot be said, at least on this record, for the Yamhill County Local Supervisory Authority. Though Defendants

have the burden of establishing their entitlement to absolute immunity, they have furnished almost no information regarding that entity, or Carter's role in it. All the court knows is that he is a "Hearing Officer." Defendants have not explained what those duties entail; whether it is a full-time position or something Carter does in addition to other duties; what qualifications are required for that post; what training is given; how many "hearing officers" are employed by Yamhill County; or how Carter is supervised and by who. For impartial legal advice, Carter apparently relied upon Settell, a lay person who was both an advocate and a fact witness during the proceedings. That doesn't pass the smell test.

Nor has the court seen evidence of the steps taken to ensure that Carter is truly an independent hearing officer, rather than just another parole officer who sometimes dons a "hearing officer" hat.[12] The Supreme Court examined this concern in Cleavinger v. Saxner, in denying absolute immunity to members of a prison disciplinary committee:

> Surely the members of the committee, unlike a federal or state judge, are not "independent"; to say that they are is to ignore reality. They are not professional hearing officers, as are administrative law judges. They are, instead, prison officials, albeit no longer of the rank and file, temporarily diverted from their usual duties. They are employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision. They work with the fellow employee who lodges the

---

[12] Carter was a probation and parole officer for at least two decades. He previously was Anderson's probation officer, reportedly meeting with Anderson on approximately 20 occasions. Anderson eventually went to prison for a year for violating probation by failing to report to Carter. This does not reassure the court that Carter's role in the present case was that of a neutral, independent arbitrator.

> charge against the inmate upon whom they sit in judgment.
> The credibility determination they make often is one between
> a co-worker and an inmate.  They thus are under obvious
> pressure to resolve a disciplinary dispute in favor of the
> institution and their fellow employee . . . .
>
> Neither do we equate this discipline committee membership to
> service upon a traditional parole board.  The board is a
> "neutral and detached" hearing body.  The parole board
> member has been described as an impartial professional
> serving essentially "'as an arm of the sentencing judge.'"
> And in the penalty context, the parole board is
> constitutionally required to provide greater due process
> protection than is the institution discipline committee.

Id. at 203-04 (internal citations omitted).

The little evidence the court has seen thus far suggests
this case falls on the Cleavinger side of the line, as opposed to
the professional administrative law judges in Butz v. Economeu,
438 U.S. 478 (1978), or even the "traditional parole board"
mentioned in Cleavinger and Sellars.[13]

Finally, Defendants contend they are immune because they
were simply executing "facially valid court orders."  However,
the document on which they purport to have relied did not say,
"Arrest Anderson and imprison him for thirty days."  That was
Defendants' choice.  There also is evidence Defendants were aware
of facts that would make the invalidity of the amended judgment
apparent to a reasonable official, and evidence they knew that

---

[13] Defendants implicitly assume that if some persons
performing tasks associated with parole, probation or PPS have
absolute immunity, then all persons throughout the nation who
perform tasks of that nature, or who have such job titles, have
absolute immunity too.  That assumption is not necessarily
warranted.  Agencies of this sort may be structured quite
differently, with disparate procedures, training, supervision,
authority, and safeguards.  What transpired in Yamhill County
would not have happened in the federal system, where the court is
more directly involved.

document was never served on Anderson nor was he informed of the conditions he later allegedly violated. Defendants also made it clear that they _weren't_ relying on the amended judgment. Rather, they claimed Anderson was automatically on PPS regardless of what the sentencing court said.

The foregoing also raises a serious question as to whether Defendants acted in the clear absence of jurisdiction, in which case absolute immunity does not apply. Defendants are not entitled to summary judgment on this ground.

### D. **Qualified Immunity**

Viewing the evidence in the light most favorable to Anderson, Defendants Carter and Settell were both aware of facts that should have made it apparent (under the applicable case law and statutes, as well as legal principles well-established even then) that they lacked jurisdiction over Anderson, and had neither authority nor probable cause to arrest, detain, or sanction him. They pressed ahead anyway.

Unlike a police officer in the field, Carter and Settell had ample opportunity to reflect on their decision and seek legal advice. A jury could also find that Settell knowingly made material false statements to obtain a warrant for Anderson's arrest.

### E. **Probable Cause**

Defendants contend they had probable cause to arrest and imprison Anderson. A jury could disagree. There is evidence Settell knew Anderson's sentence did not include a term of PPS. Carter was advised of this. Both men knew they had no jurisdiction over Anderson unless he was on PPS.

Settell and Carter also were aware that Anderson was never told he was on PPS, and had not been ordered to report, let alone given a deadline to do so.  There is evidence Settell falsely represented that Anderson had absconded, when Settell had made no inquiry and knew he had no basis for that assertion.

Settell asserts the warrant also was premised upon Anderson's failure to update his sex offender registration.  That argument fails.  Settell was not a police officer empowered to enforce all state laws.  His jurisdiction was premised upon Anderson being on PPS (or at least Defendants have not shown otherwise).  The alleged failure to register was relevant only to the extent it violated a condition of PPS; in fact, that was the basis Settell gave when he requested the warrant.

Second, Settell had no evidence that Anderson's residence was different from that listed on his registration form.  Settell had made no inquiry.  Settell now contends Anderson's residence technically changed because he was in jail several times that year.  According to Settell, each time Anderson was arrested, his "residence" became the jail.  Each time he was released and went home, his "residence" changed, necessitating re-registration.

Defendants point to no authority supporting their construction of the statute, apart from a fragment taken out of context.[14]  Nor do Defendants explain what duration of time must elapse before this rule applies.  Is it enough that Anderson was

_____

[14]  The duty to report within 10 days of being "discharged, paroled or released on any form of supervised or conditional release" is modified by the words "from a jail, prison or other correctional facility . . . in this state *at which the person was confined as a result of: (A) Conviction of a sex crime . . . .*" ORS 181.595(2) (emphasis added).  <u>See also</u> ORS 181.596(2).

in jail overnight, or for a week, or a month?  This is a criminal
statute, so it must be clear what conduct violates that law.

**F.   Procedural Due Process**[15]

Defendants again rely on inapposite statutes, *e.g.,* ORS
137.595(1) (authorizing enactment of rules regarding probation
violations), and irrelevant allegations of subsequent criminal
conduct.  Defendants also rely upon the procedures articulated in
Gagnon, 411 U.S. 778, but ignore evidence they didn't comply with
those requirements.  Defendants' argument also presumes Anderson
was on PPS, and they had jurisdiction over him, neither of which
has been shown.

**G.   Municipal Liability**

This claim may not survive a motion for directed verdict at
trial, but there is a sufficient basis to leave it in for now.
There is evidence Carter and Settell received inadequate, or even
outright improper, training regarding their authority and
responsibilities, and that Carter was instructed to deny requests
for appointment of counsel in circumstances where it should have
been granted, and to misstate the reasons for that action.
Carter and Settell testified regarding policies and procedures
they were instructed to follow.  A jury could find the foregoing
was "the moving force of the constitutional violation."  Polk
County v. Dodson, 454 U.S. 312, 326 (1981).

Some of the questionable policies, procedures, and training
may be attributable to high-ranking County officials, such as the

---

[15]  The doctrine of "substantive due process" is inapplicable
to these facts.  Other constitutional provisions adequately
address the alleged deprivation.

agency head. It is unclear from this record, but that person may have been the policy-making official for the county on those topics.

In addition, a department Director was involved in the disputed events. Richard Sly knew the sentence imposed upon Anderson did not include PPS, yet Sly approved Settell's request for a warrant charging Anderson with violating PPS, and he signed the order imposing sanctions on Anderson. On this record, and viewed in the light most favorable to Plaintiff, there may be a basis for inferring deliberate indifference to Anderson's constitutional rights. Unfortunately, neither party has delineated the relationship between the County and the various entities in this case, such as YCCC and the Local Supervisory Authority, and with the individual defendants.

Plaintiff has many hurdles to overcome, but it is premature to dismiss this claim.

### H. **Other Issues**

Defendants' other arguments do not warrant discussion. Plaintiff's brief mentions a cross-motion for partial summary judgment, but it was never filed.

### **Conclusion**

Defendants' motion (# 11) for summary judgment is denied.

IT IS SO ORDERED.

DATED this 9th day of December, 2005.


/s/ Owen M. Panner
_____
OWEN M. PANNER
United States District Judge